|  |  |
|---|---|
| CHERI BECKER, ALLEN HARTLEY, RACHEL HARTLEY, USA ISLAND SEAFOOD, INC., and SAIPAN USA FISHERIES, INC. Plaintiffs, v. INDEPENDENCE BANK, Defendant, v. COURTNEY L. ZIETZKE and ROCKFORD ZIETZKE Counterclaim Defendants. | C.A. No. 1:14-cv-534-JJM-LDA |

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Judge.

Intrigued at the prospect of becoming involved in long line fishing in the unfished waters surrounding Saipan, Cheri Becker, Allen Hartley, and Rachel Hartley invested millions of dollars to bolster the Zietzke brothers, Courtney and Rockford ("Rocky"), and their companies USA Island Seafood, Inc. and Saipan USA Fisheries, Inc. ("the Companies") in their endeavors in the Northern Mariana Islands. Neither Ms. Becker nor the Hartleys had any experience in the fishing industry, but became heavily involved, eventually becoming officers in the Companies. Despite their attempts to right the ship through reorganization and additional borrowing, their fortunes figuratively sunk in those waters, as they were unable to overcome the

mismanagement and their inexperience. Plaintiffs blame Independence Bank, who first loaned Courtney Zietzke money to fish in 2007, claiming it encouraged them to sink their money into the Companies, which the Bank knew were mismanaged and failing. The Bank blames the Plaintiffs themselves for inexperience, mismanagement, and perhaps, greed.

When all was lost, Plaintiffs sued the Bank, alleging that the Bank "knowingly defrauded" them by actively misleading and/or failing to disclose known facts about the Companies' failing finances and poor prospects. They argue that perpetrating this fraud was part of the Bank's exit strategy to recover the money and get personal guarantees on the failing loans. The Bank moves for summary judgment, arguing that it is undisputed that there was no fraud or misrepresentation because Plaintiffs knew everything the Bank knew about the Companies' finances and became deeply invested in the Companies knowing there was a risk.

*FACTS*

Courtney L. Zietzke had previous experience operating fishing companies and was looking for a loan to start fishing the newly opened waters surrounding Saipan, the largest of the Northern Marina Islands, a commonwealth of the United States in the western Pacific Ocean. Independence Bank at that time wanted to cultivate business relationships in the Northern Mariana Islands. In March 2007, the Bank loaned $1.6 million to Courtney Zietzke and his Companies,[1] later named USA Island

---

[1] The Companies were previous known as Northern Marianas Fisheries, Inc. ("NMFI") and Crystal-Seas-CNMI, Inc.

Seafood, Inc. and Saipan USA Fisheries. At the time of this loan, Courtney owned two fishing vessels, the CAP'N WADE (later renamed the LADY CAROLINA) and the F/V HUNTER J (later renamed the MISS SAIPAN). Courtney bought the CAP'N WADE in 2002 and sold it to NMFI in 2006. Courtney knew from a survey performed when he bought the ship that a Stability Study needed to be done and a Trim & Stability booklet[2] had to be on board whenever the vessel was underway. The March 2007 loan documents reflected Courtney's ownership of these vessels.

Just five months after this 2007 loan, the Bank became concerned with the financial state of the Companies. In a very explicit communication, the Bank told Courtney that the loan was in crisis and on the Bank's watch list. The Bank told Courtney that the Companies would be out of money before they even started catching fish. It encouraged Courtney to find a way to replace the depleted reserve accounts.

Courtney Zietzke's brother, Rocky Zietzke, met Plaintiff Cheri Becker in 2007. Rocky and Kenneth Mahmood[3] approached her in November 2007 and asked her to loan Mr. Mahmood $100,000 on a 120-day term. She agreed. Ms. Becker loaned Mr. Mahmood another $100,000 before the end of the term for the first loan. In March 2008, the $200,000 that Ms. Becker loaned to Mr. Mahmood up to that point,

---

[2] "Commercial ships usually have a trim and stability booklet which may contain either curves of form or hydrostatic tables and stability and trim characteristics for various conditions of loading.", http://generalcargoship.com/stability-booklet.html.
[3] While Mr. Mahmood's exact role is not clear from the record, he was engaged with Ms. Becker at the outset of her involvement in the Companies and at all times was participating as Rocky Zietzke's associate.

plus another $100,000 was converted to shares in the Companies. While she alleges that these were personal loans to Mr. Mahmood, she testified that she knew they were investments in Courtney's fishing Companies in Saipan. Nevertheless, as of March 2008, Ms. Becker was officially an investor in the Companies. She engaged an attorney to assist in setting up a new corporate structure.

Also in March 2008, Ms. Becker traveled with Rocky and Mr. Mahmood to Saipan, presumably to learn more about the businesses in which she had invested. During that trip, the Bank's majority owner, Robert Catanzaro told her that the Companies were behind on the March 2007 loan payments. Ms. Becker made those late payments to the Bank. Traveling back to Saipan two months later, Ms. Becker discovered other evidence of Courtney's mismanagement, including unpaid bills, wages and vendors, and over $250,000 that appeared to be missing. As a result, Ms. Becker, along with Mr. Mahmood and Rocky, initiated legal action against Courtney and other shareholders to remove them from control. In May 2008, Courtney assigned all of his shares in the Companies to Rocky; Ms. Becker was Chief Executive Officer by this time.

The Companies and their mew management team were working to overcome the issues caused by Courtney's mismanagement. Ms. Becker made the final decision to hire Phil Westbrook and Dave Lewis to captain the vessels. She said that the new captains' vision and expertise gave the investors "the encouragement of go forward." In addition to needing the experienced captains, Ms. Becker, Rocky, and Mr. Mahmood knew they needed more capital. Ms. Becker reached out to Allen and

Rachel Hartley to invest. During a June 2008 meeting, Ms. Becker told them that the Companies were mismanaged and funds had been misused, but that they were a good investment opportunity.

Mr. Hartley sought confirmation of Ms. Becker's pitch so he called Mr. Catanzaro from the Bank during his meeting. They spoke on the phone for less than a half hour. During this conversation, Mr. Hartley asked for financial information about the Companies. Specifically, he asked what the Companies could do financially. Mr. Hartley testified that his conversation with Mr. Catanzaro led him to believe that the investment in the Companies was a good one. Sometime afterward, Michael Sammartino, Director of Business Development at the Bank sent Mr. Hartley an email attaching pro forma tangible net worth balance sheets for the Companies.[4] The Bank sent these statements in response to Mr. Hartley's inquiry about what the Companies could do in the future. The pro forma did not indicate that the numbers were for specific years, but listed "year one" and "year two" projections. The cash on hand reflected a balance from August 2007, almost a year old at that point. Plaintiffs' expert Luke Northwall testified that prior management created this pro forma in 2007 and it was a projection of a company's potential financial success. Mr. Hartley himself testified that he knew that management, not banks, prepare

---

[4] Part of Plaintiffs' fraud claim involves allegations that the Bank sent these pro forma statements to Mr. Hartley as a current and accurate reflection of how the Companies were actually performing. In addition to the undisputed evidence that the pro forma contained projections and not actual numbers, there is no evidence that the data in the statement was not an accurate projection of what the Companies *could* do if properly managed and if the vessels started fishing.

financial reports. Despite his testimony that he believed the Bank was passing off the numbers as real in the pro forma, Mr. Hartley admitted that he knew the Companies had no income. He felt the Companies were mismanaged, but "just felt they could make a go of it." It is undisputed, however, that the Hartleys knew at this time that the Companies had no income, were behind on payments, and had outstanding expenses. When Ms. Becker asked him to invest one million dollars, he agreed. He knew that part of the investment was to get caught up on loan payments to the Bank.

By the end of 2008, it is undisputed that Ms. Becker lived in Saipan and managed the Companies. Once Mr. Hartley became an investor in June or July 2008, he took on the task of writing general accounting software to remedy the faulty system that was in place. Ms. Becker testified that she and Mr. Hartley became "very active in the daily management and joined in with the existing management team to learn this industry." As of October 3, 2008, Mr. Hartley and Ms. Becker each owned 190,000 shares of each of the Companies. They were doing their best to make the Companies succeed. In a December 2008 letter, Ms. Becker updated the Bank on various aspects of the Companies' progress and management, including details of how the investors were working to overcome the issues Courtney created through his mismanagement. Specifically, the letter states that the new management team hired captains with fishing experience, invested more of their personal funds, removed past ownership, settled lawsuits, and paid back wages and past due bills. She acknowledged that the vessels were not in the condition they thought and required

repairs. They were in the process of rehabilitating the physical plant. The LADY CAROLINA was out fishing. She noted that the investors would have "had plenty of money to go forward" "if it wasn't for the poor management of the past and all of their debts, lawsuits, etc. along with having to purchase various items that had supposedly been purchased in the existing loan." Ms. Becker concluded by asking that the Bank add $500,000 to the existing 2007 loan.

Still operating from the 2007 loan to Courtney and any personal funds that Ms. Becker and the Hartleys were contributing to keep the loan payments current, the Companies' management, the two captains, and Frank Crabtree put together a business plan in January of 2009. Ms. Becker saw parts of it, but reviewed the final plan once completed. During the same period, Mr. Hartley asked the Bank for a $1.9 million loan. In February, he had finished updating the financial data into the software and recognized the urgent need for additional capital. He sought a quick line of credit. Mr. Hartley made the February and March 2009 loan payments on the 2007 loan. He continued to work on the loan application in May 2009. The delay in applying for the additional loan funds was because the Plaintiffs were unable to come up with the required fishing reports; the MISS SAIPAN never fished and the crew of the LADY CAROLINA had not yet catch fish. This delay continued through October 2009.

At the same time, the Companies received valuation reports on the two vessels. Upon Plaintiffs' request, Allied Marine Surveyors performed surveys on the LADY CAROLINA and the MISS SAIPAN, valuing them at $890,000 and $710,000

respectively.[5] Ms. Becker asked the Bank for more funding. On December 29, 2009, Rocky, Ms. Becker, and the Hartleys entered into a loan agreement for $1,000,000, which included personal guarantees for not only the 2009 loan, but also for the March 2007 loan. This is the first time that the individual Plaintiffs became obligated to the Bank. Prior to December 2009, none of the Plaintiffs had any financial relationship or responsibility to the Bank.

Presumably, to assist Plaintiffs with setting a successful course for their fishing business, the Bank introduced them to Donald Wen, who had a successful squid operation. Ms. Becker testified that she met with Mr. Wen in February or March of 2010. She testified, "He didn't want to have a portion of our businesses, he wanted to create a third business that was going to be called ISP, International Seafood Processing, and we were going forward on that." Ms. Becker indicated that Mr. Wen became her mentor and that she appreciated the help he gave her.

Despite this influx of $846,580.29,[6] the Companies were almost out of money within months; they had just over $60,000 left by April 19, 2010. The Bank could not loan the Companies any more money because the Plaintiffs were underperforming borrowers. Plaintiffs got a loan from Commonwealth Development Authority to fund the Companies' operations. They failed to see a profit, however.

---

[5] Plaintiffs dispute these figures. The LADY CAROLINA's designer valued that vessel at $500,000 brand new. In a 2012 inspection, Gregory Kiser, a AWS Certified Welding Inspector, identified numerous problems with the vessels.

[6] As a condition of the loan, the Bank deducted $153,419.71 to pay off the balance of a direct loan it gave to Courtney in 2007.

To add further strain on their finances, the Coast Guard informed the Companies in May 2011 that the LADY CAROLINA needed a stability booklet to fish. First, they needed to make repairs to get the stability booklet. Plaintiffs endeavored to make them, but the vessels still did not have the required stability booklets by August 2012. Ms. Becker updated the Bank and asked for a six-month deferral on the loan payments. In December 2012, the Bank did modify the loan, adjusting it to interest only payments for 24 months. Mr. Hartley made those payments until December 2014. There is no dispute that Plaintiffs have failed to pay since and that the loans are in default. Plaintiffs allowed the insurance on the vessels to lapse. A typhoon later destroyed the vessels.

## PROCEDURE

The three individual investors, Ms. Becker and Mr. and Mrs. Hartley, along with the two operating Companies filed a seven-count complaint, asserting seven causes of action against the Bank: (1) fraudulent misrepresentation and concealment, (2) breach of the implied duties of good faith and fair dealing, (3) instrumentality lender liability, (4) breach of fiduciary duty, (5) conversion, (6) negligent misrepresentation and omission, and (7) unjust enrichment. The Bank answered and filed a six-count counterclaim against the Plaintiffs and third-party defendants Courtney Zietzke and Rockford Zietzke alleging four counts of breach of contract, unjust enrichment, and conversion.

*STANDARD OF REVIEW*

"Summary judgment is appropriate only when 'there is no genuine issue as to any material fact' and 'the moving party is entitled to a judgment as a matter of law.'" *Sparks v. Fid. Nat'l Title Ins. Co.*, 294 F.3d 259, 265 (1st Cir. 2002) (quoting Fed. R. Civ. P. 56(c)). The substantive law identifies the facts that are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* "In deciding a summary judgment motion," this Court "must view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in the nonmoving party's favor." *Sparks*, 294 F.3d at 265.

*THE BANK'S MOTION FOR SUMMARY JUDGMENT*

In asserting these claims against the Bank, Plaintiffs seek to hold it liable for a series of representations and/or omissions where the Bank allegedly made statements that led Plaintiffs to believe that their investment in the Companies was sound. According to Plaintiffs, the Bank's statements were false because Mr. Catanzaro (and others at the Bank) knew but failed to disclose that the Companies were mismanaged and in dire financial condition and that, the two vessels were inoperable. Plaintiffs allege that the Bank was motivated to make these false misrepresentations and omissions because it had an exit strategy—it wanted to recover on the loans it made to the Companies and knew it would not without new

investors and an infusion of cash. Believing the Companies to be potential gold mines, Plaintiffs invested in them to their personal financial ruin.

Because most of Plaintiffs' claims hinge on whether the Bank made fraudulent and/or negligent misrepresentations, the Court will discuss those claims first.

### A. Fraud & Misrepresentation Claims (Individual Plaintiffs)

The elements Plaintiffs must meet in order to prove their fraudulent and negligent misrepresentation are very similar. "Under Rhode Island law, to establish a claim for fraudulent misrepresentation, a plaintiff must allege that the defendant 'made a [misrepresentation] intending thereby to induce plaintiff to rely thereon' and that the plaintiff justifiably relied thereon to his or her damage." *Francisco v. U.S. Marshalls Serv.*, C.A. No. 11-231L, 2014 WL 652147, at *13 (D.R.I. Feb. 19, 2014) (quoting *Clitex Clothing Co. v. DiSanto*, 148 A.2d 273, 275 (R.I. 1959)). The Rhode Island Supreme Court has set forth the four elements a plaintiff must prove: "(1) a false representation; (2) knowledge of the statement's falsity; (3) intent to induce reliance; and (4) detrimental reliance." *Francisco*, 2014 WL 652147, at *13 (citing *Women's Dev. Corp. v. City of Cent. Falls*, 764 A.2d 151, 161 (R.I. 2001)). "A claim of fraudulent concealment is not actionable absent a duty to disclose" that "depends on the circumstances and typically arises in commercial transactions; it encompasses concealment of basic facts when a party knows the other party is mistaken and will enter an agreement or transaction based on the mistaken belief. *Francisco*, 2014 WL 652147, at *13.

The elements of the negligent misrepresentation and omission claim are: 1) a misrepresentation of a material fact; 2) the party making the representation must do so without knowledge as to its truth or falsity, or must do so under circumstances in which he or she should have known of its falsity; 3) the party making the representation must intend to induce another to act upon it; and 4) an injury must result to the party acting in justifiable reliance on the misrepresentation. *Mallette v. Children's Friend & Serv.*, 661 A.2d 67, 69 (R.I. 1995).

The Hartleys and Ms. Becker base their fraud and negligent misrepresentation claims on the following three facts: 1) Mr. Catanzaro at the Bank told Ms. Becker that the Companies could be sound investments that merely needed an infusion of cash and better management; 2) the Bank gave Mr. Hartley false financial statements that misrepresented the financial health of the Companies, and 3) the Bank failed to disclose the fact that the two vessels were inoperable and incapable of fishing.

After extensive discovery, the undisputed facts do not bear out in Plaintiffs' favor on these claims. The record does not support the legal conclusion that there were any misrepresentations to Ms. Becker, fraudulent or otherwise. Rocky Zietzke and Mr. Mahmood approached Ms. Becker in 2007 by for a loan. She first loaned Rocky $100,000, and then another $100,000. Ms. Becker knew that the money was an investment in Rocky's brother's fishing company in Saipan. She did not reach out to the Bank before loaning Rocky money. There is no evidence that the Bank made

any representation—whether fraudulent or negligent—to influence Ms. Becker to loan Rocky any money or to get involved with the Companies.

Ms. Becker's first conversation with Mr. Catanzaro at the Bank was in March 2008 when she was in Saipan to check out the Companies. Mr. Catanzaro told her that the Companies were behind on the March 2007 loan payments to the Bank. She made those payments after Mr. Catanzaro allegedly told her that the Companies were a good investment, but just needed an infusion of cash. This, Ms. Becker argues, was a fraudulent and negligent misrepresentation because the Bank knew the Companies were in bad shape. However, the Bank did not need to tell Ms. Becker that because she knew when she loaned Rocky money that the Companies needed an influx of cash and had not yet made any income fishing.[7]

In May 2008, Ms. Becker became CEO of the Companies.[8] Recognizing that the Bank was right about the Companies needing more money, Ms. Becker and Rocky Zietzke approached Mr. Hartley in June 2008 to invest in the Companies. Ms. Becker told him the Companies were mismanaged and funds were misused. He called Mr. Catanzaro at the Bank before investing to inquire about what the Companies' potential was. In response, the Bank sent Mr. Hartley the pro forma financial

---

[7] Moreover, this is a similar message that the Bank gave Courtney in 2007—the Companies needed to get more money and to start catching fish.

[8] In any event, two months later in May 2008, it is undisputed Ms. Becker knew that during Courtney's ownership, "the companies were generally mismanaged, with common issues, including late or nonpayment of vendors, misuse of corporate funds and lack of production by the companies." She learned on a trip to Saipan that month that the Bank was on the verge of foreclosing, lawsuits were pending, they had not paid bills and employees, and funds were missing. At this point, her eyes were or should have been wide open to the state of the Companies' financial health.

projections that Courtney prepared for the Bank in 2007. Mr. Hartley cannot now argue that he reasonably relied on the pro forma financial statement in the face of his testimony. He testified that he asked Mr. Catanzaro what the Companies' potential was, not for the Companies' actual performance; he knew the pro forma was a projection of the Companies' potential; he knew those types of statements were prepared by management, not a bank; he knew the Companies had not caught, processed, or sold any fish to date; he knew the Companies were behind on loan payments; and he knew the asset numbers listed in the pro forma were not current.

In the face of his knowledge that the Companies had a history of mismanagement and were not only not yet profitable, but also in debt, Mr. Hartley committed one million dollars to CEO Ms. Becker.[9] Therefore, the Court finds that the Bank did not make misrepresentations about the Companies to the Plaintiffs and any reliance on those statements was not justified or reasonable in the face of this knowledge.

Moving on to the vessels, it is undisputed that the Bank did not own the two vessels at any time. Courtney bought one, later renamed the LADY CAROLINA, in 2002. In conjunction with this sale, Courtney commissioned a survey, which recommended that the vessel would require a Stability Study and a booklet that they had to carry aboard the vessel at all times. The March 2007 loan indicated that the

---

[9] Neither Plaintiff became obligated to the Bank until December 29, 2009 when, after they pursued additional funding with the Bank, they agreed to an additional one-million-dollar loan and to take on the obligations of the 2007 loan. Before committing to the December 2009 loan, both Plaintiffs were heavily involved in the Companies.

Companies owned the LADY CAROLINA and another vessel, later renamed the MISS SAIPAN. They did not use the proceeds from the 2007 Bank loan to purchase the boats, but in part to equip the boats to fish.

Plaintiffs argue that the Bank valued the vessels at $2 million based on nothing – the boats were in bad shape and inoperable – and they only discovered the defects in the vessels, which the Bank knew about, after they closed on the December 2009 loan and personally guaranteed the 2007 loan. The Bank counters that the Companies owned the vessels prior to the March 2007 loan and the individual Plaintiffs, as officers and investors, owned the vessels such that they knew or should have known of their condition.

The Court finds that the Bank did not make representations about the vessels such that Plaintiffs' claims fail here. Ms. Becker was CEO by May 2008. The Hartleys invested in 2008 and Mr. Hartley was Vice President of the Companies by November 2008. The Companies owned the vessels and as officers, Ms. Becker and the Hartleys knew or should have known by at least the end of 2008 that there were obstacles to getting the vessels out to fish. The fact that the Bank had a security interest in the vessels incident to the loans does not impose any duty on the Bank to alert the vessels' owners about mechanical or compliance problems with them. Moreover, the Bank did not value the vessels–the Companies commissioned the valuations in February 2009 in order to get the loan from the Bank later that year. The valuations belonged to the Companies, not the Bank.

Even if the Court were to agree, for summary judgment purposes, that there are disputed facts such that a jury could find that the Bank made misrepresentations and/or omissions, the most basic difficulty with Plaintiffs' fraud claims is that they could not have reasonably relied on any such misrepresentations or omissions. It is undisputed that both Plaintiffs knew, prior to investing in the Companies and years prior to becoming obligated to the Bank, that the Companies were mismanaged, behind on loan payments, saddled by lawsuits, and not bringing in any income. As officers, they owned the vessels and knew or should have known that they were in bad shape. Their pleas that they were defrauded and misled fall on deaf ears in light of all of the evidence they had about the Companies before they became indebted to the Bank in 2009. Their reliance was not reasonable or justified. As such, Plaintiffs' claims for fraudulent and negligent misrepresentations and/or omissions fail. The Court GRANTS the Bank's Motion for Summary Judgment on these two claims.

### B. Breach of Implied Duties of Good Faith and Fair Dealing (All Plaintiffs)

The Bank moves for summary judgment on this claim, arguing that because Plaintiffs' allegations are rooted in tortious, not contractual conduct, their claim for breach of the implied duties of good faith and fair dealing fails under Rhode Island law. "Rhode Island recognizes that virtually every contract contains an implied covenant of good faith and fair dealing between the parties." *Crellin Techs., Inc. v. Equipmentlease Corp.*, 18 F.3d 1, 10 (1st Cir. 1994). "[E]very breach of the covenant of good faith and fair dealing implicates a breach of contract[.]" *Hord Corp. v. Polymer Research Corp. of Am.*, 275 F. Supp. 2d 229, 237 (D.R.I. 2003) (citing *Ross-Simons of*

*Warwick, Inc. v. Baccarat*, 66 F. Supp. 2d 317, 330 (D.R.I. 1999)). Ultimately, "the implied contractual term is only found in the context of a binding contract between the parties." *Lifespan/Physicians Prof'l Servs. Org., Inc. v. Combined Ins. Co. of Am.*, 345 F. Supp. 2d 214, 225 (D.R.I. 2004) (citing *Centerville Builders, Inc. v. Wynne*, 683 A.2d 1340, 1342 (R.I. 1996)). "The applicable standard in determining whether one has breached the implied covenant of good faith and fair dealing is whether or not the actions in question are free from arbitrary or unreasonable conduct." *Ross-Simons of Warwick, Inc.*, 66 F. Supp. 2d at 329 (the promisee to a contract must act consistently with the purposes of the contract).

Plaintiffs have not asserted a breach of contract claim in this case. There can be no claim for a breach of the implied duty of good faith and fair dealing without a parallel breach of contract claim. *See Lifespan/Physicians Prof'l Servs. Org., Inc.*, 345 F. Supp. 2d at 225. Even if the Court were to consider this claim, only the December 2009 contract would be implicated because it was made between the Plaintiffs and the Bank. The March 2007 loan is not because it was between Courtney Zietzke and the Bank.

Plaintiffs' allegations on the December 2009 contract are essentially a reiteration of those made on their fraud-based claims. They allege that, even though the Bank provided the December 2009 loan to enable them to operate the Companies, the Bank thwarted their efforts before that contract was made by failing to disclose the extent to which the Companies were in financial and legal trouble, unreasonably trying to sell the Companies to Donald Wen, and failing to disclose the fact that the

vessels did not have the required stability booklets. These allegations sound in tort, not contract so do not provide a basis for making this claim. *See Hord Corp.*, 275 F. Supp. 2d at 237 ("[c]laims for breach of the covenant of good faith sound in contract, not in tort.").

Plaintiffs acknowledge that the purpose of the 2009 loan was to continue to fund the Companies in their pursuit of fishing in the waters surrounding Saipan. They have failed to allege any arbitrary or unreasonable conduct that demonstrates that the Bank breached its implied duty to fulfill its end of the bargain on the December 2009 contract. There is no dispute that the Bank provided the December 2009 loan funds to Plaintiffs and did not interfere with Plaintiffs' obligation to repay the loan based on the contract terms. Under these circumstances, there is no breach of the implied duties of good faith and fair dealing. As such, the Court GRANTS the Bank's motion on this claim.

### C. Instrumentality Lender Liability (Corporate Plaintiffs)

"The instrumentality theory is akin to the piercing of the corporate veil doctrine, and has generally been used by *third party creditors* seeking to hold a lender liable for the debts of the borrower." *FAMM Steel, Inc. v. Sovereign Bank*, 571 F.3d 93, 104 (1st Cir. 2009) (emphasis in original). This claim is an awkward fit here in light of the parties' positions as lender and borrower. Nevertheless, the Court will consider it on the record presented. In this claim, the Companies essentially allege that the Bank, as lender, took such control over the Companies that the Bank should be held liable for the Companies' debts. The Bank counters that it did not control the

Companies, but merely monitored the Companies' financial health and disbursed the loan proceeds in accordance with the terms of the loan, which gave the Bank certain rights to receive financial updates and reports.

There is no Rhode Island Supreme Court precedent on this claim, but Justice Michael A. Silverstein of the Rhode Island Superior Court ruled that a plaintiff must establish "actual, operative, total control" in order to establish liability. *Jacob Licht, Inc. v. Capco Steel, LLC*, No. PB 12-4739, 2014 WL 6075972, at *7 (R.I. Super. Nov. 10, 2014) (quoting *Krivo Indus. Supply Co. v. Nat'l Distillers & Chem. Corp.*, 483 F.2d 1098, 1105 (5th Cir. 1973)). In that case, the court held that a lender's control over a borrower's finances that is based solely on the exercise of powers found in the loan agreement does not, by itself, amount to such control as would justify equitable subordination. *Jacob Licht, Inc.*, 2014 WL 6075972, at *7; *In re Clark Pipe & Supply Co.*, 893 F.2d 693, 701 (5th Cir. 1990) ("Through its loan agreement, every lender effectively exercises "control" over its borrower to some degree.").

The analysis obviously turns on the level of control the Bank exercised here. Based on the undisputed evidence in the record, the Court finds that the Bank did not exercise the requisite control over the Corporate Plaintiffs in this case to allow the instrumentality liability claim to proceed. Courts have found control where a bank owns company stock, attends shareholder meetings, votes on stock, places bank employees as directors or officers of the companies, or tells a company which bills to pay or to ignore. *See In re Beverages Int'l Ltd.*, 50 B.R. 276, 283 (Bkrtcy D. Mass. 1985); *In re Am. Lumber Co.*, 5 B.R. 470, 478 (D. Minn. 1980). There is no evidence,

let alone disputed evidence, that the Bank did any of these things. Plaintiffs allege that the Bank told them what to do, when to do it, and how to do it. However, the undisputed evidence demonstrates the opposite–Ms. Becker told the Bank that she and the other investors initiated legal action to replace Courtney Zietzke, hired the captains, and the Bank had no role in purchasing the vessels because Courtney Zietzke owned them before the Bank loaned him money in March 2007. There is no actual or total control here. The Bank disbursed the money and received regular financial reports in accordance with the loan documents. The fact that the Bank monitored the Companies' financial health "does not alone amount to improper control." *Schwan's Sales Enter., Inc. v. Commerce Bank & Tr. Co.*, 397 F. Supp. 2d 189, 198 (D. Mass. 2005).

There is a dispute, however, over the involvement of Donald Wen. Plaintiffs allege that the Bank reached out to Mr. Wen to take over the Companies without Ms. Becker's consent. The Bank denies this and asserts that it connected Mr. Wen with Plaintiffs with their permission so that Mr. Wen could help her learn the fishing business. While a surreptitious sale sounds like a sinister exercise of total control, the Court finds that the evidence on this point is lacking. The Bank involved Mr. Wen in an effort to assist the Plaintiffs in an industry in which he had expertise and they did not. Ms. Becker testified that she welcomed using Mr. Wen as a resource and that he acted as her mentor in the business. And even if Plaintiffs perceived that the Bank overstepped some boundary by contacting Mr. Wen, "creditors are afforded some leeway in the amount of involvement they have in the management of their

debtor's affairs." *Jacob Licht, Inc.*, 2014 WL 6075972, at *7 (citing *F.C. Imports, Inc. v. First Nat'l Bank of Boston, N.A.*, 816 F. Supp. 78, 91 (D.P.R. 1993)). "The giving of general business advice on occasion, strong bargaining and the use of leverage or informing the debtor of the consequences of its failure to turn the business around do not constitute control." 1 Gerald L. Blanchard, *Lender Liability: Law, Practice, and Prevention* § 5:8, at 326 (2018).

As such, the Court finds that the evidence presented upon the allegations provides no basis for liability under the instrumentality theory of liability. The Court GRANTS the Bank's motion on this claim.

### D. Breach of Fiduciary Duty (Corporate Plaintiffs)

Plaintiffs allege that the Bank was a fiduciary and it breached its duty by failing to disclose that the vessels were inoperable, worthless, and lacking stability booklets, by soliciting potential buyers when the Companies were not for sale, and by misappropriating funds. Plaintiffs must prove first that the Bank was a fiduciary and that it breached its duties to Plaintiffs. It is worth noting at the outset that no state or federal court in Rhode Island has found a fiduciary relationship between a bank and a borrower. *In re Belmont Realty Corp.*, 11 F.3d 1093, 1101 (1st Cir. 1993).

To determine whether a fiduciary relationship exists

[t]he court may consider a variety of factors, including the reliance of one party upon the other, the relationship of the parties prior to the incidents complained of, the relative business capacities or lack thereof between the parties, and the readiness of one party to follow the other's guidance in complicated transactions.

*Simpson v. Dailey*, 496 A.2d 126, 129 (R.I. 1985); *Fleet Nat'l Bank v. Liuzzo*, 766 F. Supp. 61, 68 (D.R.I. 1991). "The Rhode Island Supreme Court has explained that this duty imposes upon the fiduciary the obligation to act in the utmost good faith and to place the interests of the corporation before his or her own personal interests." *Ed Peters Jewelry Co. v. C & J Jewelry Co.*, 51 F. Supp. 2d 81, 99 (D.R.I. 1999), *aff'd,* 215 F.3d 182 (1st Cir. 2000) (citation omitted). A fiduciary cannot act "when he has an individual interest in the subject matter or when his interest is in conflict with that of the person for whom he acts" without first gaining consent. *Id.* (citing *Point Trap Co. v. Manchester*, 199 A.2d 592, 596 (1964)).

Although a determination of whether a fiduciary relationship exists may be a fact determination, *Indus. Gen. Corp. v. Sequoia Pac. Sys. Corp.*, 44 F.3d 40, 44 (1st Cir. 1995), "the existence of a fiduciary relationship is limited to the unusual case where the relationship goes far beyond that found in an ordinary business transaction." *Fraioli v. Lemcke*, 328 F. Supp. 2d 250, 267 (D.R.I. 2004). Where the Court can make such a determination, summary judgment is appropriate. *See Rhode Island Hosp. Trust Nat'l Bank v. Bogosian*, 11 F.3d 1092, 1101 (1st Cir. 1993) (upholding district court's fiduciary duty determination on summary judgment).

The Court finds that the Bank was not a fiduciary in this case. The most significant piece of documentary evidence to this point is the December 14, 2008 letter from USA Islands Seafood, Inc., written by Ms. Becker to Mr. Sammartino at the Bank and Mr. Joseph Diego of the United States Department of Agriculture. The

apparent purpose in sending this letter was to ask the Bank to add $500,000 to the March 2007 loan. In advocating for this infusion, Ms. Becker detailed for the Bank exactly what she and the other investors had been working on to eliminate the remnants of Courtney's poor management decisions and to get the Companies operating efficiently. She did not ask for the Bank's advice; she and the other investors had formed a "great team," by ousting Courtney and hiring the two ship captains. The Companies were in no way reliant on the Bank for anything except funding. The Bank did not exert atypical control in the context of these loans. This was a normal banker-client relationship—nothing more. "A good business relationship with a banker, with whom one has discussed one's underlying business at length, is not enough." *In re Belmont Realty Corp.*, 11 F.3d at 1101.

Because the Court finds that the Bank was not a fiduciary, the Companies' claim for breach of a fiduciary duty fails, and the Court GRANTS the Bank's motion on that claim.

### E. Conversion (Corporate Plaintiffs)

The Companies claim that the Bank converted $45,000 of loan proceeds by using them to pay for vacations disguised as inspection trips. The Bank counters that both the March 2007 and December 2009 loans allocated funds for the Bank to make such inspection trips. Therefore, the Bank charged the amounts with the Companies' knowledge and permission and in accordance with the Bank's contractual rights.

"To maintain an action for conversion, plaintiff[s] must establish that [they] w[ere] in possession of the personalty, or entitled to possession of the personalty, at

23

the time of conversion." *Montecalvo v. Mandarelli*, 682 A.2d 918, 928 (R.I. 1996). "[T]he gravamen of an action for conversion lies in the defendant's taking the plaintiff's personalty without consent and exercising dominion over it inconsistent with the plaintiff's right to possession." *Fuscellaro v. Indus. Nat'l Corp.*, 368 A.2d 1227, 1230 (R.I. 1977).

The Companies have failed to present any disputed evidence of their conversion claim. The March 2007 and December 2009 loan documents demonstrate that the parties agreed that the Bank would use part of the loan proceeds to pay for travel expenses.[10] The Companies argue that the trips were improper; inferring that Mr. Sammartino used these trips for leisure activities, but there is no evidence of this. In light of this carve out in the loan documents, there can be no dispute that the Companies were not entitled to these funds and the Bank did not take them without the Companies' consent. *See Narragansett Elec. Co. v. Carbone*, 898 A.2d 87, 97 (R.I. 2006).

There was no conversion; therefore, the Companies' claim for breach of a fiduciary duty fails and the Court GRANTS the Bank's motion on that claim.

---

[10] The March 2007 loan dedicated $58,043 under "Fees & Closing Costs" to "Independence Bank Loan Revision Fee; Hearing Fee; Re-packaging Fee; Travel Expenses." ECF No. 44-4 at 4. The December 2009 loan document stated that the Bank would use $19,000 of the loan for "travel expenses (for mandatory site visit)." ECF No. 44-22 at 4.

## F. Unjust Enrichment (All Plaintiffs)

All Plaintiffs allege that the Bank was unjustly enriched because they paid hundreds of thousands of dollars on the loans that the Bank induced them to enter through fraudulent and negligent misrepresentations.

The doctrine of unjust enrichment applies when, "it is contrary to equity and good conscience for one to retain a benefit that has come to him at the expense of another." *Merchants Mut. Ins. Co. v. Newport Hosp.*, 272 A.2d 329, 332 (R.I. 1971). "In order for a party to recover under a theory of unjust enrichment, that party must prove that (1) a benefit has been conferred upon the other party, (2) that party appreciated the benefit, and (3) that party accepted the benefit in a manner in which it would be inequitable to retain that benefit without paying for it." *Hord Corp.*, 275 F. Supp. 2d at 239.

Plaintiffs' arguments that the Bank was enriched because the two loans on which Plaintiffs made payments were induced by fraud are without merit. First, Plaintiffs cannot argue that they conferred a benefit on the Bank merely by making the payments that they contracted to make. The Bank loaned them the money; the act of paying loaned money back does not equate to conferring a benefit. In fact, it is undisputed that Plaintiffs have failed to pay much of the balance owed to the Bank so any allegation of a benefit conferred or unjust enrichment is unsupported by the evidence. The Court GRANTS the Bank's Motion for Summary Judgment on this claim.

*THE BANK'S COUNTERCLAIMS*

Now that the Court has ruled on the Bank's motion as to Plaintiffs' claims, it will turn to the Bank's motion as to its counterclaims against Plaintiffs and third-party Plaintiffs, Courtney and Rocky Zietzke. The Bank has brought counterclaims for breach of contract, unjust enrichment, and conversion against the individual Plaintiffs and Counter Defendants. There are two contracts—the March 2007 loan and the December 2009 loan. Both obligate the Companies, Rocky, Courtney, and the individual Plaintiffs. Courtney guaranteed the March loan and Ms. Becker and the Hartleys guaranteed both loans in December 2009.

The Bank argues that Plaintiffs breached the contract because the Bank paid the loan proceeds, and the Plaintiffs never paid back the Bank. Plaintiffs owe $1,360,310.64 on the March 2007 loan; $911,306.49 is owed on the December 2009 loan. It is undisputed that the loans are in default and the Bank has accelerated the loan.

Plaintiffs argue that they do not owe money on those contracts because they were based on fraud and misrepresentations and a contract induced by fraud can be rescinded. Because the Court has determined based on the undisputed evidence that the Bank did not fraudulently or negligently induce Plaintiffs to enter into these loan contracts, their arguments opposing the Bank's breach of contract claim fail.

Judgment enters against Courtney Zietzke, Rocky Zietzke, Ms. Becker, and the Hartleys on the Bank's breach of contract claims.[11]

*CONCLUSION*

Because the Court has found that there are no disputed issues of material fact on any of the Plaintiffs' claims, the Court GRANTS the Defendant's Motion for Summary Judgment.  ECF No. 43.

IT IS SO ORDERED:

_____
John J. McConnell, Jr.
United States District Judge

March 29, 2018

---

[11] The Bank moved for summary judgment on all counts.  The Court dismisses the claims for unjust enrichment and conversion as well in light of the Court's decision above.